IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JACQUELINE LAPPIN, M.D. | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:21-cv-00543 |
| | § | |
| SCOTT & WHITE CLINIC | § | |
| *Defendant* | § | |

## PLAINTIFF JACQUELINE LAPPIN, M.D.'S APPLICATION TO CONFIRM AND RENDER JUDGMENT ON ARBITRATION AWARD

Plaintiff Jacqueline Lappin, M.D., files this application to confirm and render judgment on the arbitration award attached as Exhibit A.

### Background

1. This is an employment discrimination case.

2. Pursuant to the parties' agreement to arbitrate, Plaintiff filed a lawsuit against Defendant at the American Arbitration Association. A true and correct copy of that lawsuit is attached as Exhibit B. The lawsuit alleged that Defendant breached its contract with Plaintiff and wrongfully discriminated against her on the basis of her gender, among other claims.

3. Defendant denied all claims.

4. The lawsuit was assigned to the Honorable Catherine M. Stone for arbitration.

5. After an arbitration hearing conducted via Zoom, the arbitrator rendered the attached arbitration award in favor of Plaintiff. Exh. A. The arbitrator determined that Defendant both breached its contract with Plaintiff and wrongfully and illegally discriminated against Plaintiff based on her gender. The arbitrator awarded Plaintiff a total of **$337,866.32**, plus postjudgment interest. *Id.* In addition, the arbitrator ordered that all fees and expenses of the American Arbitration Association, totaling $2,950.00, and the compensation and expenses of the arbitrator, totaling $50,130.00, be borne by Defendant.

6.   Payment to Plaintiff was due on May 23, 2021. Plaintiff has instructed Defendant to mail a check to her attorney's office, but to date, no payment has been received.

## Jurisdiction

7.   The arbitration award, which was signed on April 23, 2021, provides "The Award is final and binding and is intended to be enforceable in any Court of competent jurisdiction." Exh. A, p. 10.

8.   Here, the Court has federal jurisdiction over the lawsuit under 28 U.S.C. § 1331 because Plaintiff brought Equal Pay Act claims. Exh.B.

## Argument and Authorities

9.   The Federal Arbitration Act provides:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9. Here, the award was signed on April 23, 2021, and the award has not been vacated, modified, or corrected. Plaintiff therefore asks the Court to confirm and render judgment on the attached arbitration award. Exh. A.

10.   Defendant has asked Plaintiff not to make these proceedings public and has even attempted to prevent Plaintiff from making these proceedings public by seeking relief from the arbitrator. But the arbitrator declined to provide Defendant with any relief. In addition, as noted by the American Arbitration Association: "The AAA takes no position on whether parties should or should not agree to keep the proceeding and award confidential between themselves. The parties always have a right to disclose details of the proceeding, unless they have a separate confidentiality agreement."https://www.adr.org/StatementofEthicalPrinciples#:~:text=An%20arbitration%20proceeding%20is%20a,and%20award%20confidential%20between%20themselves

11.   There is no such confidentiality agreement here.

**Request for Relief**

For these reasons, Plaintiff requests that the Court confirm and render judgment on the attached arbitration award. Plaintiff further requests that the Court award Plaintiff her attorneys' fees, costs, and interest. Plaintiff further requests all other just relief.

Respectfully submitted,

FROST DOMEL PLLC
Emily Frost
State Bar No. 24036601
711 W. 7th Street
Austin, Texas 78701
(512) 640-5501
(512) 692-2895 FAX
emily@frostdomel.com

By: _____
Emily Frost

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing is being served on counsel of record via the CM/ECF system on this the 28th day of May, 2021:

Shafeeqa W. Giarratani
Derek T. Rollins
Ogletree Deakins Nash Smoak & Stewart, PC
301 Congress Avenue, Suite 1150
Austin, TX 78701
shafeeqa.giarratani@ogletreedeakins.com
derek.rollins@ogletree.com

COUNSEL FOR DEFENDANT

_____
Emily Frost

**AMERICAN ARBITRATION ASSOCIATION**
**Employment Arbitration Tribunal**

| | | |
|---|---|---|
| JACQUELINE LAPPIN, M.D. | § | |
| | § | |
| Claimant, | § | |
| | § | |
| v. | § | **AAA NO. 01-18-0002-1978** |
| | § | |
| SCOTT & WHITE CLINIC, | § | |
| | § | |
| Respondent. | § | |

### INTERIM AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the written employment agreement entered into by the above-named parties and in accordance with the written *Employment Arbitration Rules* of the American Arbitration Association, and having been duly sworn and having duly heard the proofs and considered the allegations of the parties, and in accordance with the facts and the law, as more fully explained herein, issue this INTERIM AWARD.

### PRELIMINARY STATEMENT

Jacqueline Lappin, M.D. asserts claims against her former employer, Scott & White Clinic, for violations of the Equal Pay Act, gender or sex discrimination under the Texas Labor Code, breach of contract, conversion, and violations of the Texas Theft Liability Act. Scott & White denies Dr. Lappin's claims. The parties conducted pre-hearing discovery and on August 24 through 27, 2020 and September 2, 2020, an evidentiary arbitration hearing was held before the undersigned Arbitrator. The Arbitrator, counsel, parties, witnesses, and court reporter appeared remotely via Zoom.

1

EXHIBIT "A"

Dr. Lappin appeared personally and was represented by attorneys Emily Frost of Frost Domel PLLC, and Russell Frost of the Law Office of Russell Frost, PLLC. Scott & White appeared by representative, Dr. Harry Papaconstantinou ("Dr. Papa"), and was represented by attorneys Shafeeqa Giarratani and Derek Rollins of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., and Enid Wade of Baylor Scott & White Health. Testimony from multiple witnesses was presented and hundreds of pages of written documents were received in evidence. At the conclusion of the hearing on September 2, 2020, the parties indicated they had provided all proof they intended to present, other than for damages, attorney's fees, and costs, which by agreement will be considered by briefing following issuance of this award. Post-hearing briefing on liability was provided by Dr. Lappin on October 23, 2020 and by Respondent on December 11, 2020. Dr. Lappin filed a written reply on December 31, 2020. The record and hearing on liability were declared closed as of December 31, 2020.

The Official Record of the testimony and hearing was transcribed by Julie Jordan, Certified Shorthand Reporter; it consists of more than a thousand pages and was considered by me in rendering this award.  I have also considered the filed pleadings and discovery, the exhibits received and discussed in testimony, and the written briefing. In rendering this Interim Award, I have, as permitted by law, assessed the credibility of the witnesses. *See Xtria L.L.C. v. Intern'l. Ins. Alliance, Inc.*, 286 S.W. 3d 583, 597 (Tex. App.—Texarkana 2009, pet. denied) (An arbitrator, as a factfinder, may assess the credibility of witnesses and is entitled to believe or disbelieve the testimony of either party's witnesses.)

2

## CONTENTIONS OF THE PARTIES

Dr. Lappin contends that after approximately 5 years of employment as the Division Director of Abdominal Surgery and Transplants at Scott & White's Temple location, she was discriminated against and wrongfully terminated in violation of the Texas Labor Code.  She also presents a claim for equal pay violations. Additionally, she asserts claims for breach of her employment contract, *quantum meruit,* conversion, and violations of the Texas Theft Liability Act. Scott & White Clinic denies all claims.

Dr. Lappin stipulated at the hearing that Dr. Tun Jie is the only comparator under both the Equal Pay Act and the Texas Labor Code for unequal pay claims.  As to the claim for sex discrimination under the Texas Labor Code, she contends all physician division directors are comparators.

## REVIEW OF CLAIMS

### *Violations of the Equal Pay Act*

Dr. Lappin claims Scott & White violated the Equal Pay Act when it terminated her employment and then hired a male physician, Dr. Tun Jie, at a higher salary to replace her as the Director of Abdominal Transplant Surgery.

A *prima facie* Equal Pay Act case requires a showing that the "employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

In this case Dr. Lappin's *prima facie* burden requires a showing that: (1) Scott & White employed Dr. Lappin and then employed as her replacement, Dr. Tun Jie, a person of the opposite sex, in jobs requiring substantially equal skill, effort, and responsibility; (2) the two jobs were performed under similar working conditions; and (3) Dr. Lappin was paid less than Dr. Jie. *See* 29 U.S.C. § 206(d); *Reznick v. Associated Orthopedics & Sports Medicine, P.A.*, 104 Fed. Appx. 387, 390 (5th Cir. 2004). Dr. Lappin failed to establish the first prong of the test, thus she has not met her burden.

Approximately 18 months after Dr. Lappin's termination, Dr. Jie began working at Scott & White at a salary of $700,000 compared with the $612,532 salary Dr. Lappin was paid when she left.[1] However, the evidence shows that Dr. Jie's position required greater responsibilities and effort than did Dr. Lappin's position. After Dr. Lappin was terminated, Scott & White restructured the surgery divisions and separated Hepatobiliary Surgery from Endocrine & Oncology Surgery. Dr. Jie was hired as the Surgical Division Director for two separate divisions: HPB Surgery and Abdominal Transplant Surgery. To the extent Dr. Jie is the Division Director for Abdominal Transplant Surgery, his position is the same as was Dr. Lappin's. But that is only half of the equation. In his role as the administrative head of two surgical departments, Dr. Jie serves on hospital committees in both divisions and assumes division director responsibilities for budgeting, operations, program development, and supervision of junior physicians in both divisions. Notably Dr. Jie supervises 4-5 surgeons, while Dr. Lappin supervised only one

---

[1] The evidence shows that the actual salary of surgeons is dynamic and can be recalculated every 6 months. Although Scott & White disputes that Dr. Lappin was actually paid less than Dr. Jie, I have assumed, without deciding, that she was paid less.

surgeon during her entire tenure at Scott & White and had administrative division director responsibilities for only one division.  And although Dr. Lappin is qualified to do HPB surgeries generally, the emphasis on these surgeries significantly increased once the new surgical division was created and more complex hepatobiliary surgeries were performed.  Dr. Lappin notes that she had greater on-call responsibilities than Dr. Jie; however, the on-call responsibilities are only one part of the job and do not eliminate the added responsibilities assumed by Dr. Jie as director of 2 surgical divisions.

With the change in structure of the surgical divisions came greater effort and responsibilities assumed by Dr. Jie.  Based on the record, I conclude the positions held by Dr. Lappin and Dr. Jie are not substantially similar or equal and justify the varying pay. *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166, 171 (5th Cir. 1975) (holding that 2 managers, one with greater responsibilities, were not substantially equal); *Ahad v. Bd. Of Trustees of S. Ill. Univ.*, No. 15-cv-3308, 2019 WL 1433753 (C.D. Ill. Mar. 28, 2019) (holding that differences between 2 physicians' administrative, surgical, and teaching responsibilities meant they were not substantially equal for collective action purposes).

There is no evidence that gender or sex considerations were factors in the restructuring of the surgical divisions and there is no question that Dr. Jie assumed more responsibilities in his dual role. But, even if Dr. Lappin had established a *prima facie* case, Scott & White established an exception under the Act that the pay differential was based on factors other than sex or gender. *See* 29 U.S.C. § 206(d)(1). In addition to administrative and leadership responsibilities for 2 surgical divisions,

5

Dr. Jie was tasked with building the HPB surgical division, a division that presented the opportunity for greater production or wRVU potential.  These factors are gender neutral.   Further, the salary for the position of director of these 2 surgical divisions was set before Dr. Jie was hired and before the clinic knew the gender of the successful candidate. Scott & White followed a process involving consultation with the clinic's compensation group that created a salary range based on considerations of salary, volume of work, administrative responsibilities, and anticipated wRUVs.  The proposed salary was then approved by several upper-level medical officers and the Hospital's compensation board.   This type of process based on objective considerations is exemplary of the affirmative defense of compensation based on factors other than sex.  *See Reznick*, 104 Fed. Appx. at 391.

Dr. Lappin's claim for Equal Pay Act violations is denied.

### Gender/Sex Discrimination

Dr. Lappin presents a claim of gender or sex discrimination under the Texas Labor Code contending she was terminated from employment for conduct that was less egregious than similar conduct of other male division director physicians. To establish a *prima facie* case she must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action (termination), and (4) she was replaced with a similarly situated male, or similarly situated males were treated more favorably. *See Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *Tex. Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 290, 294 (Tex. App.—El Paso 2016, no pet.).

6

Scott & White contends that Dr. Lappin has not established her *prima facie* case because she presented no evidence that any male employee who was "nearly identical" to her received better treatment and none engaged in the same type or severity of unacceptable conduct as Dr. Lappin. Scott & White primarily relies on testimony from 3 witnesses:

Dr. Papa testified that Dr. Lappin focused on her division rather than on teamwork for all surgical divisions. He also referred to an incident where Dr. Lappin hung up on another physician and to an incident where she had an aggressive confrontation with Alan Sims, a clinic manager. He also referenced an issue involving Dr. Moritz in which he said Dr. Lappin berated him for looking at a specimen in her absence. Dr. Lappin responded to this testimony by noting her concern about fair treatment of the Abdominal Transplant Surgery division was not addressed by Dr. Papa and she felt like her division was forced to follow a system that benefited other divisions and devalued her division. She acknowledged her conduct with Sims and said she apologized to him after the event and it ended with a cordial reconciliation and no further issues.  Finally, she admitted hanging up on Dr. Edisen out of frustration when he was not available for a task she deemed critical.

Dr. Deb Doherty worked under Dr. Lappin as an abdominal transplant surgeon and testified Dr. Lappin had verbal outbursts, yelled and screamed, engaged in divisive conduct, and upset Dr. Doherty so much that it adversely affected her delivery of patient care. Dr. Lappin notes that Dr. Doherty never raised these complaints until after Dr. Lappin was terminated.

Candace Gourley testified that on numerous occasions she talked with Dr. Lappin about her gruff conduct and testified generally that Dr. Lappin created a culture of fear and that staff and other physicians were walking on eggshells because of her.  She also testified that a former Scott & White administrator, Nance Conney, indicated that Dr. Lappin's conduct caused employee turnover in the clinic.

The testimony of other witnesses painted quite a different picture of Dr. Lappin. Her predecessor, Dr. Jaffers, testified that Dr. Lappin was easy to get along with, easy to talk to, and not ego driven.  He said she was friendly, skilled at talking to people, and listened to other points of view. He also described her performance in growing the kidney transplant department as "phenomenal" and believed she could not have achieved such success had she been mistreating doctors and staff.

Dr. Jaffers' view of Dr. Lappin was echoed by Dr. Little, who described Dr. Lappin as "composed, thoughtful, speaks from the heart." He stated she was respectful, kind, caring, and receptive, and that residents enjoyed working with her. He felt her termination was a "huge loss for our community."

Gourley's testimony was directly contradicted by Conney, who denied ever telling Gourley that Dr. Lappin was having meltdowns or yelling and cursing in front of patients. To the contrary, Conney testified that she enjoyed working with Dr. Lappin and that she never saw her do anything abusive, derogatory, or bullying. She was unaware of anyone leaving Scott & White's employment because of discord with Dr. Lappin.

As noted, Dr. Lappin generally denied the witnesses' testimony regarding blow ups and inappropriate conduct or offered explanations and further information

8

regarding resolution of issues. She admitted to advocating for the Abdominal Surgery division and admitted she had high standards and expectations. She acknowledged that Gourley told her she was like a teapot, sometimes hot, but she also stated that Gourley warned her that there was a sort of boys' club among surgeons and women were treated differently.

Human Resources Director Phil Kendzior testified that prior to Dr. Lappin coming to his office crying after she left what she perceived as a confrontational meeting with Gourley and Dr. Bruce Kaplan, he had never received any complaints about her from Gourley or anyone else. He did not interview either Dr. Kaplan or Dr. Doherty, who was also at the meeting, and he did not have any first-hand knowledge of her demeanor and conduct in surgery or in the clinic.

Jennifer Mitchell, an operating room nurse, was perhaps the most credible of all witnesses who testified.  Still employed at Scott & White, she forthrightly stated her regret that Dr. Lappin had been terminated.  She admitted that her interaction with Dr. Lappin was largely in the operating room, but she never saw or heard Dr. Lappin act inappropriately, use curse words in front of patients, or bully anyone. She specifically noted 2 male division director physicians who were difficult to work with and contrasted them with Dr. Lappin as a doctor who facilitated teamwork. She described Dr. Lappin as gracious, professional, and inspiring. She got to know people on a personal level and boosted morale. Indeed, Mitchell testified that "Dr. Lappin was one of the main reasons I wanted to be part of the transplant team.  I wanted to be part of what she was doing at Scott and White. It was a big motivating factor."

9

To the extent that Scott & White contends it terminated Dr. Lappin for the non-discriminatory reason of conduct unbecoming a leader, that contention is not supported by the record. While the concept of unbecoming conduct is gender neutral, the preponderance of the credible evidence does not support a finding of conduct rising to this somewhat amorphous "unbecoming" level. One consistent element of testimony from all witnesses was that all physicians push back, speak their mind, disagree with one another on occasion, and at times become angry under stress. Conney testified that she had seen nearly every surgeon she had worked with have at least one outburst. Dr. Jaffers and Dr. Little said disagreements among physicians were not uncommon and were a normal "part of any health care environment." Dr. Papa likewise acknowledged that all doctors at times engage in strong or assertive communications.

Scott & White contends the same actor inference defeats Dr. Lappin's *prima facie* case – Dr. Papa hired her and fired her, and it makes no sense that a supervisor would hire a woman only to fire her because she is a woman. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000). But there are reasons to reject such an inference when, as here, the evidence regarding the conduct at issue is controverted and the record shows disparate treatment.

Scott & White claims there is no merit to Dr. Lappin's contention that she was treated less favorably than similarly situated males because none of those male males exhibited behavior involving outbursts and creating a culture of fear. But that argument assumes the record establishes that Dr. Lappin engaged in such a

pattern of conduct and I have found that the preponderance of the credible evidence fails to establish such a course of conduct.

In arguing other male directors were treated more favorably, Dr. Lappin points to the testimony of Dr. Jaffers who admitted that on 2 occasions he had become impatient and angry in the operating room and thrown instruments across the room. He viewed that as unbecoming conduct, but he was not terminated for his conduct. Instead, he was counseled and offered a chance to attend anger management classes. Similarly, Dr. Sai-Sudhaker testified that he was argumentative and disrespectful toward other physicians in the past, for which he was counseled and disciplined, but not terminated.

In addition to contending Dr. Lappin was terminated for conduct unbecoming a leader and exhibiting a pattern of escalating abusive misconduct, Scott & White contends her termination was proper under the "no cause" 90-days' notice provision of her employment agreement. Dr. Lappin responds that this articulated reason is merely a pretext for discrimination, or that discrimination was a motivating factor in Scott & White's decision to terminate her.

Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Allen v. Radio One of Tex. II, L.L.C.*, 515 Fed. Appx. 295, 299 (5th Cir. 2013). Pretext can also be established when the employer's proffered reasons are inconsistent, change over time, or are factually unsupported. *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 575 (5th Cir. 2003).

As noted, Scott & White offered varying reasons for Dr. Lappin's termination. The contractual "no cause" provision was provided in pre-hearing discovery responses as the reason for termination. In pre-hearing deposition testimony and at the hearing, Dr. Papa stated Dr. Lappin was terminated for conduct unbecoming a leader. Finally, at the hearing Scott & White's counsel referenced a pattern of escalating abusive bullying behavior towards others as outlined above. These changing justifications for Dr. Lappin's termination cause doubt as to the veracity of the justifications.

It is uncontroverted that all other division directors are male and that none was terminated for conduct unbecoming a leader, even though several of those division directors were specifically counseled about their anger issues or "mistreatment" of others. HR Director Kendzior received a complaint about Dr. Sai-Sudhakar for mistreatment of co-workers, but he was not fired. Dr. Martin was counseled by Dr. Papa for being argumentative. Dr. Jaffers was counseled about his anger displays in surgery and offered anger management classes. Dr. Lappin was not offered similar opportunities to correct any behavioral deficiencies. Significantly, Dr. Lappin's employment agreement provided for termination if she was "perceived as uncooperative, difficult to get along with, or is incompatible with other employees of the Clinic," but Scott & White did not utilize this provision when terminating her, instead relying on the "no cause" provision, and then later providing different reasons for her termination.

Based on my review of the record and giving due regard to the credible evidence, I find that Dr. Lappin met her prima facie burden, the burden shifted to

12

Scott & White to articulate a legitimate nondiscriminatory reason for Dr. Lappin's termination, and that each of the 3 reasons given for terminating Dr. Lappin's employment is pretextual. Dr. Lappin has established her claim for wrongful termination based on gender/sex discrimination.

### *Breach of Contract*

Scott & White extended a written job offer to Dr. Lappin on April 9, 2013 in which it promised to pay Dr. Lappin a bonus of 10% of her base compensation "when the Kidney/Pancreas Transplant Program achieves a Center of Excellence status." In 2018, 2 insurance companies awarded Center of Excellence status to the Kidney/Pancreas Transplant Program. Dr. Lappin contends Scott & White's failure to pay her the 10% bonus is a breach of contract. Scott & White responds that the signed Physician Employment Agreement, not the offer letter, is the governing document. The Employment Agreement contains a merger clause that it "contains the entire agreement of the parties," and because the Employment Agreement does not mention the bonus, Scott & White contends there is no contract to pay a bonus and thus no breach. Scott & White also claims that even if it had agreed to pay a bonus, the offer letter provided that the bonus would be calculated and "provide[d] for … when achieved at the end of the fiscal year in which the Center of Excellence is achieved." Because Dr. Lappin was no longer employed at the end of the fiscal year in which the status was achieved, Scott & White contends no payment was due. Scott & White's arguments are rejected as set forth below.

An integration or merger clause in a contract generally "presumes that all prior negotiations and agreements relating to the transaction have been merged

13

into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence." *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co., Inc.,* 234 S.W.3d 711, 719-20 (Tex.—Eastland 2007 pet. denied).  This rule has exceptions, however, and it "does not prohibit evidence of a collateral agreement." *Id.* at 720.  In the instant case the offer letter, and particularly the promise of a bonus, can be viewed as a collateral agreement.  It does not contradict the terms of the Employment Agreement and addresses a specific promise which Dr. Lappin's supervising physician, Dr. Papa, testified at the hearing had been extended to her.

The record establishes that Scott & White's Center of Excellence status resulted from Dr. Lappin's success in developing the kidney transplant program.  As noted by her predecessor, Dr. Jaffers, she grew the program from 25-30 transplants a year to more than 150 transplants a year. Dr. Jaffers complimented her on her leadership skills and testified that she achieved such success with the team effort of many professionals working within the program. The Center of Excellence status was awarded in 2017 while Dr. Lappin was still employed by Scott & White.  Like Dr. Jaffers, Dr. Papa recognized the efforts of Dr. Lappin in obtaining the Center of Excellence recognition. On this record, there is no doubt that the triggering contingency occurred, largely because of Dr. Lappin's efforts, thus giving rise to Scott & White's duty to pay the promised bonus. And payment of the bonus is not excused merely because Dr. Lappin was no longer employed by Scott & White "at the end of the fiscal year in which the Center of Excellence [was] achieved." The offer letter contained no such requirement and Texas courts have recognized that promised bonuses may be due and owing even to former employees. *See Miller v.*

14

*Riata Cadillac Co.*, 517 S.W.2d 773, 775 (Tex. 1975) (holding that an employee discharged without good cause prior to the time specified for payment of a bonus is entitled to recover a pro rata share of the bonus); *Handy Andy, Inc. v. Rademacher*, 666 S.W.2d 300 (Tex. App.—San Antonio 1984, no pet) (upholding jury verdict awarding payment of a bonus to a former employee even though employee no longer worked for employer at end of fiscal year when bonus was payable).  In any event, I have found her termination to be wrongful and she would have been employed at the end of the fiscal year absent her termination.

Dr. Lappin has met her burden to establish a breach of contract; she has shown (1) existence of a valid, enforceable contract, (2) her performance under the contract, (3) breach of the contract by Scott & White, and (4) damages sustained as a result of the breach, in an amount to be established via additional briefing.  *See E-Learning LLC v. AT&T Corp.*, 517 S.W.3d 849, 858 (Tex. App.—San Antonio 2017, no pet.) (setting forth elements for breach of contract); *Southwell v. University of the Incarnate Word*, 974 S.W.2d 351, 354-55 (Tex. App.—San Antonio 1998, pet. denied) (same).[2]

### *Conversion and Texas Theft Liability Act Violation*

Dr. Lappin presents a claim for conversion and violation of the Texas Theft Liability Act based on her contention that personal property from her office was not returned to her after she was terminated.  The record establishes that at the time of her termination she was not permitted to return to her office; instead, Scott & White personnel inventoried and packed up the contents of her office before

---

[2] In light of this ruling on the breach of contract claim, Dr. Lappin's alternative *quantum meruit* claim is not reached.

returning the packed boxes to her.  Dr. Lappin contends the refusal to allow her to enter her office to collect her belongings is evidence of intent to deprive her of her property for which there was no justification or excuse.  Alleged to be missing are a flash drive containing all her references, her procedure log, various personal files, and journals.

To establish a conversion claim, a claimant must show (1) the claimant owned, possessed, or had the right to immediate possession of property, (2) the property was personal property, (3) the respondent wrongfully exercised dominion or control over the property, and (4) the claimant suffered injury. *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet. denied). Under the Theft Liability Act a person commits the offense of theft if he "unlawfully appropriates property with intent to deprive the owner of property" without the owner's "effective consent." TEX. CIV. PRAC. & REM. CODE ANN. § 134.003(a); TEX. PENAL CODE ANN. § 31.03(a)-(b).

Dr. Lappin has not met her burden to establish either conversion or theft under the statute. First, she has not shown with certainty that the allegedly missing thumb drive or journals were actually among her belongings in her office or that they were not among the journals and thumb drives returned to her. Second, she had not established that Scott & White intended to deprive her of any of her property.  The record does not indicate any malicious or illegal intent on the part of Scott & White.

### SUMMARY OF AWARD

Having carefully considered the submitted testimonial and documentary evidence and the applicable legal authorities, I make the following findings and conclusions based upon a preponderance of the credible evidence and the applicable laws:

(1)   Dr. Lappin's claim against Scott & White for equal pay violations is not supported by a preponderance of the evidence in the record and is denied; Dr. Lappin takes nothing by this claim.

(2)   Dr. Lappin's claims against Scott & White for conversion and violations of the Theft Liability Act are not supported by a preponderance of the evidence in the record and are denied; Dr. Lappin takes nothing by these claims.

(3)   Dr. Lappin's claim against Scott & White for wrongful termination based on gender/sex discrimination is supported by a preponderance of the credible evidence.

(4)   Dr. Lappin's claim for breach of contract for non-payment of a 10% bonus is supported by a preponderance of the credible evidence.

(5)   Dr. Lappin's claim for *quatum meruit* relief is denied as moot.

As agreed at the arbitration hearing, the parties are now directed to file written briefing on damages and attorney's fees as follows:

Dr. Lappin may file a written brief on damages and attorney's fees, not to exceed 15 pages, no later than 20 days from the date of this Interim Award.

Scott & White may file a written response brief on damages and attorney's fees, not to exceed 15 pages, no later 20 days after receipt of Dr. Lappin's brief.

Reply briefs will not be permitted absent good cause shown.

This Award is in settlement of all liability claims submitted to this Arbitration. The parties are ordered to file written briefing and supporting documentation as set forth above. All liability claims not expressly granted or expressly reserved in this Award are hereby denied.

This Award shall remain in full force and effect until such time as a Final Award is rendered.

SIGNED on February 1, 2021.

*/s/ Catherine M. Stone*
Hon. Catherine M. Stone
Arbitrator

## AMERICAN ARBITRATION ASSOCIATION
### *Employment Arbitration Tribunal*

| | | |
|---|---|---|
| JACQUELINE LAPPIN, M.D. | § | |
| | § | |
| *Claimant* | § | |
| | § | |
| v. | § | **AAA NO. 01-18-0002-1978** |
| | § | |
| SCOTT & WHITE CLINIC, | § | |
| | § | |
| *Respondent* | § | |

### FINAL AWARD

I, the undersigned Arbitrator, having been designated in accordance with the written employment agreement entered into by the above-named parties and the written *Employment Arbitration Rules* of the American Arbitration Association, and Jacqueline Lappin, M.D. being represented by Emily Frost of Frost Domel PLLC, and Russell Frost of the Law Office of Russell Frost, and Scott & White Clinic being represented by Shafeeqa Giarratani and Derek Rollins of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., and Enid Wade of Baylor Scott & White Health,  and based on the evidence and the law as more fully explained herein, issue this Final Award.

### PRELIMINARY STATEMENT

On February 1, 2021, an Interim Award was issued in this matter resolving all liability issues, but by agreement of the parties a decision on damages and attorneys' fees was reserved.  Dr. Lappin thereafter filed her written Claimant's Brief on Damages, and Scott & White filed its Respondent's Response Brief. The matter has been fully briefed and reviewed and is properly before the Arbitrator. I have considered the filed pleadings, including all claims and defenses, the filed discovery, the relevant testimony of witnesses, and all pre-hearing and post-hearing briefing as relevant to the damages and attorneys' fees claims.  The standard of

proof is by a preponderance of the evidence unless stated otherwise.   To the extent any recitation of the factual background or the parties' contentions differs from a party's position, that is a result of the Arbitrator's determinations regarding credibility, relevance, burden of proof, and weight of the evidence in making this Final Award.

**DAMAGES AWARD**

### Breach of Contract Damages

As determined in the Interim Award, Dr. Lappin established a breach of contract based on Scott & White's failure to pay her a bonus of 10% of her "base compensation when the Kidney/Pancreas Transplant Program achieves a Center of Excellence status."   Two different insurance companies granted such status in the 2018 fiscal year.

Dr. Lappin contends her base salary as of March 5, 2018 was $328,732 and that she should receive two 10% bonuses of $32,873.20 each, for a total of $65, 746.40, plus pre-judgment and post-judgment interest.

The record does not support an award of two 10% bonuses. Scott & White's offer letter states it will provide Dr. Lappin "**a** bonus of 10% of your base compensation when the Kidney/Pancreas Transplant Program achieves **a** Center of Excellence status." (emphasis added). The clear singular language supports the conclusion that only one bonus was contemplated. Accordingly, Dr. Lappin is awarded $32,873.20 as breach of contract damages.

### Back Pay Damages Under the Texas Labor Code

Because I have found that Dr. Lappin was wrongfully terminated based on gender/sex, she is entitled to recover back pay damages under TEX. LAB. CODE § 21.285. Back pay damages calculated by her expert Dr. Tom Glass total $209,057. That damage calculation is based on a comparison with Dr. Jie's compensation, who I have determined did not perform the same or substantially similar job as Dr. Lappin. Therefore, that calculation is rejected.

Dr. Lappin suggests two other methods for calculating back pay losses. The first method uses an average monthly salary of $63,760 from Scott & White based on what she was actually paid in 2018 (January 1 through June 29). She then compares such "lost" income stream for 33 months (the length of time from her last day of payment from Scott & White to the anticipated date of the arbitration award) with her actual earnings from her new job and determines she has back pay losses of $440,227. However, this method of calculation is not based on her pay rate at the time of termination and thus is rejected. *See Randolph v. Laeisz*, 896 F.2d 964, 967 (5th Cir. 1990) (citing *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983)) (using pay at date of termination).

A second suggested method for calculating back pay results in back pay losses of $402,025, but that methodology is also not based on Dr. Lappin's rate of pay at the time of termination. Additionally, the calculation is speculative and therefore does not meet the required standard of proof. *See Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1147 (5th Cir. 1991).

Following her termination Dr. Lappin was without a job for two months. Her new position at St. David's pays her $52,640 more per year than her last rate of pay

at Scott & White. Dr. Lappin acknowledges that the compensation report issued shortly before her termination reduced her average monthly salary from Scott & White to $51,044. When compared with her actual earnings from her new job, this calculates to a back pay loss of $20,545 through March 31, 2021. Respondent contends this is the proper calculation for back pay.

Although Dr. Lappin acknowledges this method of calculation and the final resulting number, she asks the Arbitrator to reject this calculation for several reasons. The reasons proffered are not supported by the evidence and involve a certain amount of speculation regarding anticipated earnings and RVU units that could or would be achieved had Dr. Lappin not been terminated. I decline to engage in guesswork in calculating this element of damages. Recognizing that 34 months rather than 33 months have elapsed since the date of Dr. Lappin's termination which would actually reduce her damages under this calculation method, I nonetheless find that Dr. Lappin is entitled to back pay damages in the amount of $20,545.

### Front Pay Damages Under the Texas Labor Code

Front pay is an equitable remedy left to the Arbitrator's discretion. *Tex. Youth Comm'n v. Koustoubardis*, 378 S.W.3d 497, 502 (Tex. App.—Dallas 2012, pet. dism'd); *see Dell, Inc. v. Wise*, 424 S.W.3d 100, 116–17 (Tex. App.—Eastland 2013, no pet.). Dr. Lappin seeks an award of $799,584 as front pay because reinstatement to her job at Scott & White is not feasible for a variety of reasons. An award of front pay is not warranted under the facts of this case

given the higher salary that Dr. Lappin now earns in her new position at St. David's.  Her claim for front pay damages is denied.

***Compensatory Damages Under the Texas Labor Code***

Dr. Lappin requests an award of $300,000 as compensatory damages for past and future emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other noneconomic losses.  *See* TEX. LAB. CODE § 21.2585(a). Scott & White contends the evidence does not rise to the level required to support any award for non-economic damages. To the contrary, the evidence illustrates more than mere worry or embarrassment, but rather a high degree of mental pain and distress. Dr. Lappin testified that her termination was traumatic and devastating and caused sleeping problems, nightmares, severe humiliation, fear of going out in public, and distress about her professional reputation.  She lost her academic titles and benefits, which included a loss of prestige and community with faculty and staff.  She sought professional assistance from a therapist and a psychiatrist.  And while it is true that she was previously treated for depression, her testimony regarding her post-termination condition credibly established the heightened level of distress she suffered and that is recoverable under Texas law.  Because Dr. Lappin has not prevailed on all of her asserted liability claims, I conclude that her request for compensatory damages should be reduced. A preponderance of the evidence supports an award of $100,000 for these non-economic damages sustained in the past.  I make no award for future compensatory damages.

***Punitive Damages Under the Texas Labor Code***

Punitive damages may be awarded under the Labor Code if the respondent's actions were conducted with malice or reckless indifference to the claimant's rights.

TEX. LAB. CODE § 21.2585(b). Dr. Lappin requests a punitive damages award of $1,000,000, reduced to the statutory cap of $300,000.

Dr. Lappin contends malice and reckless indifference are established by (among other things) the fact that Dr. Papa and Phil Kendzior were both decision makers on her termination and both were tasked with implementing and upholding policies that provide gender equality among employees, yet they did not do so with her. She faults them for not engaging in any comparison or analysis of her conduct as against the conduct of male surgeons. She also contends malice is established by the changing stated basis for her termination and the alleged continued requests for cost reimbursement from Medicare for her administrative services after her termination.

After considering the documentary evidence and the witness testimony, I conclude Dr. Lappin has not established by clear and convincing evidence that her termination was conducted with either malice or reckless indifference to her right to be free of such discriminatory termination.  Dr. Papa and other decision makers exhibited no animosity toward Dr. Lappin.  The discriminatory conduct appeared to be caused in part by poor communication and application of an implicitly biased double standard against Dr. Lappin based on her sex or gender. Her request for exemplary damages is denied.

### ATTORNEYS' FEES AND COSTS

#### *Attorneys' Fees*

Dr. Lappin was the prevailing party in this arbitration proceeding.  *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009).  As the

prevailing party, she is entitled to recover attorneys' fees on claims that allow for such recovery and to the extent that entitlement to such recovery was proven.

Dr. Lappin seeks to recover her reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. & REM CODE § 38.001 and TEX. LAB. CODE § 21.259. Using the lodestar method, Dr. Lappin requests an award of at least $287,842.50 in attorneys' fees, as well as an upward departure in an unspecified amount.

I have reviewed all redacted and unredacted attorney billing records submitted by Dr. Lappin's counsel. The billing records do not fully segregate the time entries for work performed between the various claims asserted, but Dr. Lappin contends segregation is unnecessary because the equal pay claim (which has been rejected) and the gender discrimination claim (which has been granted) are inextricably intertwined, thus allowing for recovery of all fees. Respondent disagrees and further contends the fees are overstated, claiming the records indicate duplicative, excessive, or inadequately documented work by counsel. Respondent suggests the fees and costs be reduced by at least half. *See Von Clark v. Butler*, 916 F.2d 255, 259 (5th Cir. 1990).

There is no question that Dr. Lappin's counsel are qualified, achieved a successful result for their client, and expended significant time and effort on her behalf. But the billing records do not fully indicate what efforts were expended in furtherance of what claims, and only two asserted claims were granted, while the equal pay claim and the two theft-related claims were denied. And the equal pay claim and the gender discrimination claim are not so intertwined as to eliminate the segregation requirement. The law requires greater clarity when a party seeks to

shift payment of fees to the opposing party. *See generally Rohrmoos Venture v. UTSW DVA Healthcare, LLP,* 578 S.W.3d 469 (Tex. 2019).

Based on the evidence and the arguments and authorities provided by the parties, I find that an upward departure in attorneys' fees as requested by Dr. Lappin in unwarranted.  I further find that a reduction in amount of fees requested is appropriate and that based on the evidence, Dr. Lappin is entitled to recover $143,921.00 for the reasonable and necessary attorneys' fees for work performed in presenting her meritorious claims.

### *Recoverable Costs*

Dr. Lappin requests an award of $30,960 as recoverable costs, which includes a request for a discretionary award of $13,950 for Dr. Tom Glass's expert fees.  The request for an award of reimbursement for Dr. Glass's fees is denied.  *See* TEX. LAB. CODE §21.259.  His calculations included comparisons to Dr. Jie's salary, which was irrelevant in light of the liability rulings, and in any event his work included errors and corrections necessitating a second report.  I conclude, in my discretion, that such financial burden is not appropriately shifted to Scott & White. The remaining costs, including costs for Glass's deposition, total $17,010.00, and I find Dr. Lappin is entitled to recover such amount as costs.

## FINAL AWARD

Based on the foregoing, it is hereby ORDERED:

1.  Claimant, Jacqueline Lappin, M.D., shall recover from Respondent, Scott & White Clinic, the sum of **$153,418.20** itemized as follows:

    a.  $32,873.20 for breach of contract;

    b.  $20,545.00 as back pay for violation of the Texas Labor Code; and

    c.  $100,000.00 for non-economic damages.

2.  Claimant, Jacqueline Lappin, M.D., shall recover from Respondent, Scott & White Clinic, pre-judgment interest on the total of above specified damages awarded at a rate of 5% from June 4, 2018 to April 22, 2021, which totals **$23,517.12**.

3.  Claimant, Jacqueline Lappin, M.D., shall recover from Respondent, Scott & White Clinic, **$143,921.00** as a reasonable attorneys' fee for work performed on her meritorious claims.

4.  Claimant, Jacqueline Lappin, M.D., shall recover from Respondent, Scott & White Clinic, **$17,010.00** as allowable costs, including fees paid to the American Arbitration Association.

5.  All fees and expenses of the American Arbitration Association, totaling $2,950.00, including the compensation and expenses of the Arbitrator totaling $50,130.00, shall be borne by Respondent, Scott & White Clinic.

6.  The above sums are to be paid on or before thirty days from the date of this award and shall bear interest as permitted by TEX. FIN. CODE § 304.003 beginning 30 days from the date of this Award until paid in full.

7.  This award disposes of all claims, counterclaims, and defenses submitted to this arbitration.

8.  All claims, counterclaims, defenses, and pending motions not expressly granted in this Award are hereby denied.

9.  This Award is final and binding and is intended to be enforceable in any Court of competent jurisdiction.

10.     The Interim Award issued on February 1, 2021 is incorporated herein by reference and is hereby reaffirmed.

Signed on April 23, 2021.

*Catherine M. Stone*
Hon. Catherine M. Stone
Arbitrator

BEFORE THE
AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| JACQUELIN LAPPIN, M.D., | § | |
|     Claimant | § | |
| | § | |
| v. | § | No. 01-18-0002-1978 |
| | § | |
| SCOTT & WHITE CLINIC | § | |
|     Respondent. | § | |

## CLAIMANT'S SECOND AMENDED COMPLAINT

Complainant Jacqueline Lappin, M.D., files this Second Amended Complaint and would respectfully show the Arbitrator as follows:

### Parties

1.   Complainant Jacqueline Lappin, M.D. ("Complainant" or "Dr. Lappin"), is an individual residing in Bell County, Texas. Complainant may be reached through her attorney, Emily Frost, Frost Domel PLLC, 711 W. 7th Street, Austin, Texas 78701, phone (512) 640-5501.

2.   Respondent Scott & White Clinic ("Scott & White" or "Company" or "Respondent") is a nonprofit corporation doing business in Temple, Texas, that has appeared in and answered this lawsuit.

### Jurisdiction and Venue

3.   Complainant brings this suit before the American Arbitration Association pursuant to the parties' arbitration agreement, which, upon information and belief, provides: "Any controversies, disputes or claims arising out of or relating to this Agreement, or breach thereof, shall be resolved solely by arbitration in Bell County in accordance with the then current rules of the American Arbitration Association, and judgment upon the award rendered may be entered in any Bell County court having jurisdiction thereof." Physician Employment Agreement, section V(j). Complainant does not have a signed copy of this Agreement.

EXHIBIT "B"

4.   A federal court would have federal question jurisdiction over the lawsuit under 28 U.S.C. § 1331 because the suit arises under 29 U.S.C. § 206(d).

5.   Venue would be proper in a district where Respondent resides or where a substantial part of the events or omissions giving rise to this suit occurred. 28 USC § 1391(b)(1) and (2).

**<u>Conditions Precedent</u>**

6.   All conditions precedent have been performed or have occurred.

**<u>Facts</u>**

7.   Complainant is an abdominal transplant surgeon. She worked for Scott & White from 2013 to on or around March 30, 2018, as the Division Director of the abdominal transplant program ("Program").

8.   Complainant was the only female Division Director.

9.   In 2016, after the departure of two surgeons, Complainant was assigned the additional responsibility of managing the dialysis access program.

10.   Under Complainant's leadership, the Program grew exponentially. For example, before Complainant's arrival, the Program performed 20 to 30 deceased kidney transplants per year. In 2017, under Complainant's leadership, the Program performed 153 deceased organ transplants.

11.   During each of Complainant's annual reviews, her supervisor, Dr. Harry Papaconstantinou, praised her performance as outstanding.

12.   In January 2018, despite the unprecedented growth of the Program under Complainant's leadership, and despite the fact that her on-call burden was every other day for kidney transplants and every day for pancreas transplants, significantly more than any male Division Director, and despite the additional work of the dialysis access program that

Complainant had been assigned, her salary was reduced by 15%. No other male Division Director was similarly treated.

13.     In addition, despite Dr. Lappin's having achieved "Center of Excellence" status in 2017 from both Blue Cross and Blue Shield and Aetna for both pancreas and kidney transplants, the Company failed to pay her the 10% salary bonus of $65,000 it had promised her for achieving this goal. No other male Division Director was similarly treated.

14.     On March 30, 2018, Respondent informed Complainant that her employment was terminated, effective immediately. Complainant was given no reason for the termination. Respondent has since claimed that Complainant was terminated for alleged "verbal altercations."

15.     Despite multiple written requests to Respondent, Respondent has refused to return Complainant's personal belongings that were in her office, including but not limited to papers related to her credentials, her continuing medical education (CME) certificates, paperwork related to her recertification by the American College of Surgeons, paperwork related to her membership in the American Society of Transplant Surgeons (ASTS), and a purple flash drive that contains all of her references.

### Violations of the Equal Pay Act by Scott & White

16.     Complainant incorporates the foregoing paragraphs by reference. Complainant was, throughout her employment, paid less than male employees who perform substantially equal work.

17.     In fact, in January 2018, despite the unprecedented growth of the Program under Complainant's leadership, and despite the fact that her on-call burden was every other day for kidney transplants and every day for pancreas transplants, significantly more than any male Division Director, and despite the additional work of the dialysis access program that

Complainant had been assigned, her salary was reduced by 15%. No other male Division Director was similarly treated.

18.   In addition, despite Dr. Lappin's having achieved "Center of Excellence" status in 2017 from both Blue Cross and Blue Shield and Aetna for both pancreas and kidney transplants, the Company failed to pay her the 10% salary bonus of $65,000 it had promised her for achieving this goal. No other male Division Director was similarly treated.

19.   Even though Complainant performs substantially equal work to these male Division Directors, they earned significantly more than she. As a result of this wage disparity, Respondent has violated the Equal Pay Act.

20.   As a proximate result of Respondent's illegal conduct, Complainant has suffered actual damages, including lost wages and benefits measured as the difference between what Complainant received and what the male Division Directors who performed substantially equal work received. Complainant also seeks liquidated damages under 29 U.S.C. § 216 in an amount equal to the amount that Complainant was underpaid. In addition, Complainant seeks attorney's fees, expert fees, court costs, and pre- and post-judgment interest as provided by law.

### **Breach of Contract by Scott & White**

21.   Complainant incorporates the foregoing paragraphs by reference.

22.   Despite Dr. Lappin's having achieved "Center of Excellence" status in 2017 from both Blue Cross and Blue Shield and Aetna for both pancreas and kidney transplants, the Company failed to pay her the 10% salary bonus of $65,000 it had promised her for achieving this goal, in breach of the Company's agreement.

23.   The parties had a valid, enforceable agreement; Complainant tendered performance; Respondent breached the agreement; and as a result, Complainant has suffered actual damages,

including lost wages. Complainant also seeks' attorney's fees, court costs, and pre- and post-judgment interest as provided by law.

## Quantum Meruit

24.   Complainant incorporates the foregoing paragraphs by reference.

25.   Despite Dr. Lappin's having achieved "Center of Excellence" status in 2017 from both Blue Cross and Blue Shield and Aetna for both pancreas and kidney transplants, the Company failed to pay her for achieving this goal, in breach of the Company's agreement to do so.

26.   Complainant provided valuable services for Respondent; Respondent accepted the services; and Respondent had reasonable notice that Complainant expected compensation for the services. As a result of Respondent's failure to compensate Complainant, Complainant has suffered actual damages, including the reasonable value of the services. Complainant also seeks' attorney's fees, court costs, and pre- and post-judgment interest as provided by law.

## Conversion

27.   Complainant incorporates the foregoing paragraphs by reference.

28.   Despite multiple written requests to Respondent, Respondent has refused to return Complainant's personal belongings that were in her office, including but not limited to papers related to her credentials, her continuing medical education (CME) certificates, paperwork related to her recertification by the American College of Surgeons, paperwork related to her membership in the American Society of Transplant Surgeons (ASTS), and a purple flash drive that contains all of her references.

29.   Complainant owned, possessed, or had the right to immediate possession of property. The property was personal property. Respondent wrongfully exercised dominion or control over the property. Complainant has suffered injury.

30.   As a result of Respondent's wrongful actions, Complainant seeks the return of the property, actual damages, pre- and post-judgment interest, and court costs. Further, because Respondent has acted with malice, Complainant seeks exemplary damages.

### Violations of the Texas Theft Liability Act

31.   Complainant incorporates the foregoing paragraphs by reference.

32.   Despite multiple written requests to Respondent, Respondent has refused to return Complainant's personal belongings that were in her office, including but not limited to papers related to her credentials, her continuing medical education (CME) certificates, paperwork related to her recertification by the American College of Surgeons, paperwork related to her membership in the American Society of Transplant Surgeons (ASTS), and a purple flash drive that contains all of her references.

33.   Complainant had a possessory right to the property. Respondent unlawfully appropriated the property by taking it without Complainant's effective consent. Respondent appropriated the property with the intent to deprive Complainant of the property. Complainant has suffered damages as a result of the theft.

34.   As a result of Respondent's wrongful actions, Complainant seeks the return of the property, actual damages, mental anguish damages, statutory damages under the Texas Theft Liability Act, pre- and post-judgment interest, court costs, and reasonable and necessary attorneys' fees. Further, because Respondent has acted with malice, Complainant seeks exemplary damages.

<u>**Gender/Sex Discrimination in Violation of the Texas Labor Code**</u>

35.   Complainant incorporates the foregoing paragraphs by reference.

36.   Despite the fact that Complainant performed substantially equal work to her male Division Directors, they earned significantly more than she.

37.   In 2017, despite Complainant having achieved "Center of Excellence" status from both Blue Cross and Blue Shield and Aetna for both pancreas and kidney transplants, Respondent failed to pay Complainant the 10% salary bonus it had promised her for achieving this goal. Respondent has never treated similarly-situated male employees in this way.

38.   In January 2018, despite the unprecedented growth of the Program under Complainant's leadership, and despite the fact that her on-call burden was every other day for kidney transplants and every day for pancreas transplants, significantly more than any male Division Director, and despite the additional work of the dialysis access program that she had been assigned, her salary was reduced by 15%. No other male Division Director was similarly treated.

39.   On March 30, 2018, Respondent informed Complainant that her employment was terminated, effective immediately. She was given no reason for the termination. Respondent has since claimed that she was terminated for alleged "verbal altercations."

40.   Respondent has never treated similarly-situated male employees in this way. In fact, Candy Gourley, the Vice President of Administration for the Department of Surgery, remarked to Complainant about the double standard applied by Respondent to male and female surgeons, citing two male surgeons as examples.

41.   Respondent's failure to pay Complainant equally to male employees who perform substantially equal work, Respondent's refusal to pay Complainant the bonus it had promised

her, Respondent's reduction of Complainant's salary, and Respondent's termination of her employment constitutes gender/sex discrimination in violation of the Texas Labor Code.

42.   Respondent engaged in these discriminatory practices with malice or reckless indifference to Complainant's rights.

43.   As a result, Complainant seeks back pay and benefits, front pay and benefits, compensatory damages, exemplary damages, attorneys' fees, expert fees, court costs, and pre- and post-judgment interest as provided by law.

## **Request for Relief**

Complainant respectfully requests that Respondent be cited to appear and answer and that, on final trial, Complainant have judgment against Respondent as follows:

1.   Direct or general damages in an amount within the jurisdictional limits of the court;

2.   Actual damages;

3.   Past and future economic damages, including lost pay, benefits, and seniority rights;

4.   Liquidated damages;

5.   Past and future mental anguish damages, emotional pain, suffering, inconvenience, loss of enjoyment of life, reputational damages, and other non-pecuniary losses;

6.   Expert fees;

7.   Reinstatement, including reinstatement in Complainant's former position and reinstatement of lost fringe benefits and seniority rights, or front pay and benefits;

8.   An injunction enjoining future unlawful practices;

9.   Return of Complainant's property;

10.   Statutory damages under the Texas Theft Liability Act;

11.   Exemplary damages;

12.     Reasonable attorneys' fees;

13.     Prejudgment interest as provided by law;

14.     Postjudgment interest as provided by law;

15.     Court costs; and

16.     Such other and further relief to which Complainant may be justly entitled.


Respectfully submitted,


FROST DOMEL PLLC
Emily Frost
State Bar No. 24036601
711 W. 7th Street
Austin, Texas 78701
(512) 640-5501
(512) 225-5565 FAX
emily@frostdomel.com


By: _____
        Emily Frost

ATTORNEYS FOR COMPLAINANT

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2018, a true and correct copy of the foregoing was served electronically on the AAA at HiroKawahara@adr.org and on the following:

Shafeeqa W. Giarratani
Derek T. Rollins
Ogletree Deakins Nash Smoak & Stewart, PC
301 Congress Avenue, Suite 1150
Austin, TX 78701
shafeeqa.giarratani@ogletreedeakins.com
derek.rollins@ogletreedeakins.com

COUNSEL FOR RESPONDENT

Emily Frost